John W. Shleppey and Eunice E. Shleppey v. Commissioner.
Shleppey v. Commissioner
Docket No. 1895-62.
United States Tax Court
T.C. Memo 1963-165; 1963 Tax Ct. Memo LEXIS 178; 22 T.C.M. (CCH) 793; T.C.M. (RIA) 63165; June 13, 1963
*178 J. Eben Hart, Liberty Bank Bldg., Oklahoma City, Okla. and Robert E. Shelton, for the petitioners. T. W. Sommer, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The respondent determined a deficiency in income tax of $5,620.99 for the calendar year 1957. The petitioners have conceded certain adjustments appearing in the statutory notice and the only issue remaining for decision is whether any part of the purchase price received for decision is whether any part of the purchase price received by John W. Shleppey, hereinafter referred to as the petitioner, upon the sale of his business was attributable to a covenant not to compete. Findings of Fact Some of the facts have been stipulated and they are found accordingly. The petitioners are husband and wife and reside in Seattle, Washington. They filed their joint income tax return on the cash receipts and disbursements basis for the calendar year 1957 with the district director of internal revenue at Oklahoma City, Oklahoma. Petitioner's father established an outdoor advertising business in Tulsa, Oklahoma. In 1917 petitioner joined his father in the business and worked with his father *179 until the latter's death in the late 1930's. After his father died, petitioner operated the business in his mother's name until 1947. In 1947 he entered into a contract with his mother by which he acquired the business in exchange for a life annuity to his mother of $200 per month. The annuity had a value of approximately $43,200. When petitioner bought the business from his mother in 1947, $16,752.68 of the sale price was for goodwill. The annual gross income of the business in 1947 was approximately $60,000. Since 1947 petitioner has successfully operated the business in his own name as a sole proprietor. During the years 1948 to June 1957 the gross income and net income from petitioner's outdoor advertising business were as follows: Period Ending
Gross Income
Net Income
12/31/48
$ 64,363.98
$16,053.02
12/31/49
48,343.84
12,170.60
12/31/50
56,847.65
11,978.90
12/31/51
51,711.68
14,491.72
12/31/52
54,233.61
6,510.25
12/31/53
75,346.09
18,549.47
12/31/54
86,572.62
14,507.70
12/31/55
101,479.20
12,649.14
12/31/56
136,288.77
10,288.03
6/30/57
56,294.03
( 8,925.95)
Petitioner's business entailed for the most part the construction and *180 erection of poster and painted boards throughout Tulsa County, Oklahoma, and the rental of these units to various advertisers, both local and national. The rentals paid to petitioner by the advertisers depended primarily on the location of the boards and the population served by the boards. Petitioner had good coverage of the area's traffic arteries, shopping centers and the downtown section of Tulsa. The petitioner's poster boards measured 12 feet by 25 feet, which was the standard for the industry, and about 25 percent of them were illuminated. The cost of a standard-size nonilluminated poster board in 1957 ranged between $400 and $1,000. The cost of a standard-size nonilluminated painted board in 1957 ranged from $1,250 to $3,000. The cost of illumination per board was approximately $150. The differentials between the minimum and maximum costs of construction for both types of boards were attributable primarily to the degree of difficulty in erecting the board at the designated location. Between 1953 and 1957 petitioner erected approximately 105 new poster boards and expended approximately $25,000 for painted boards. In the spring of 1956, petitioner and George L. Knapp, Jr. *181 , hereinafter referred to as Knapp, commenced serious discussions regarding the sale of petitioner's business to Knapp. The parties had had earlier discussions beginning in 1954. Knapp operated a large outdoor advertising business in Kansas and Oklahoma and was the biggest operator in the Tulsa area. The parties met several times in 1956 and again in the beginning of 1957. The discussions centered on whether petitioner was definitely interested in selling and, if so, the amount he wanted to be paid for his business. In March of 1957 Knapp suggested a sales price of $185,000. Petitioner rejected this offer but indicated he would accept $220,000 provided he was paid not more than 30 percent of the purchase price upon execution of the agreement and received the balance over a period of years. Petitioner inserted the installment payment proviso at the suggestion of his accountant. Knapp agreed to petitioner's terms and indicated that he would have a contract prepared. The contract prepared at the direction of Knapp and subsequently presented to petitioner provided, in part, as follows: WHEREAS, said First Party [petitioner] is the sole proprietor and owner of a business located in *182 the City of Tulsa, Oklahoma, known as Shleppey Outdoor Advertising Company, the main office of which is located at 322 East Eleventh Street, Tulsa, Oklahoma, and desires to sell, and Second Parties [Knapp and Thomas J. Knapp] desire to purchase said business and certain assets therein: NOW, THEREFORE, for and in consideration of the amounts hereinafter set forth, and the mutual promises of the parties hereto, said First Party agrees to sell, transfer, and convey, and by these presents does sell, transfer, and convey to Second Parties, the business known as Shleppey Outdoor Advertising Company, all accounts receivable, and all the stock of goods, wares, merchandise, posting equipment, poster panels, painted bulletins, rolling stock, cards, signs, posters, banners, and equipment of every kind used by First Party in connection with the said advertising business in and about the City and County of Tulsa, Oklahoma, and other counties in Northeastern Oklahoma, * * * 7. It is understood and agreed that Second Parties are purchasing the physical assets of the said business, together with all lease right of First Party and other contractual rights assigned hereby for the sum of Eighty *183 thousand and no/100 ($80,000.00) and the further sum of One hundred and forty thousand and no/100 ($140,000) is being paid for a covenant of the First Party, which he hereby assumes, promises, and agrees as binding at the time of this signing, that said First Party will not at any time, for a period of five (5) years from the date hereof, either alone or jointly with, or as agent for, employee of any person or persons, firms, or corporations, excepting only as agent for or employee of Second Parties, either directly or indirectly, set up, exercise, conduct, or be engaged, employed, or interested in or carry on in Tulsa County, an advertising business or occupation similar to or of the same nature as the advertising business, occupation, interest and privilege heretofore exercised and conducted by said First Party and hereby sold and set over and hereafter to be carried on by the Second Parties and assigns, nor do anything to the prejudice thereof. 8. At the time of the signing of this agreement, Second Parties have paid to First Party the sum of Sixty thousand and no/100 ($60,000.00), and have delivered to First Party a promissory note payable in ten (10) annual installments of Sixteen *184 thousand and no[/100] ($16,000.00) each, with interest from maturity thereof at the rate of six (6) percent per annum, with the proviso that should any installment be not paid when due, then the entire indebtedness should, at the option of First Party, his heirs, successors, and assigns, be accelerated so that the entire amount due thereunder should become due and payable. Said note also provides that Second Parties might prepay any installment, or multiple thereof, at any time prior to maturity without premium or fee. At no time during all the discussions between Knapp and petitioner and the negotiations leading up to the formulation of the sales agreement had either party mentioned a covenant not to compete. After the contract was prepared, the parties met at petitioner's office. When the proposed contract was presented to petitioner for his signature, petitioner noticed the provision relating to the covenant not to compete and asked Knapp what it meant. Knapp informed petitioner, who was not represented by legal counsel or by his accountant at the meeting, that the covenant would not hurt petitioner in any way, but would be of some benefit to him, i.e., Knapp. There was no *185 discussion between petitioner and Knapp concerning the amount allocated to the covenant. Relying on Knapp's representations as to the covenant's effect, petitioner signed the sales agreement as prepared by Knapp. The sales agreement was executed on April 8, 1957, and pursuant thereto petitioner transferred the following physical assets to Knapp: 348 poster boards, 15 painted boards, 28 painted signs, 12 neon signs and 4 automobiles. Petitioner also transferred numerous advertising account contracts and location leases to Knapp. The principal factors in determining the selling price of an outdoor advertising business are the market area being served and the physical structures, i.e., the boards. At the time of the sale in 1957, the physical assets transferred to Knapp by petitioner were worth at least $220,000. On his income tax return for 1957 petitioner reported his gain from the sale of his business to Knapp computed on the installment sale basis as capital gain. Opinion The sole issue for our consideration is purely a factual one; that is, whether the petitioner sold a covenant not to compete for $140,000 at the same time he sold his outdoor advertising business. The respondent *186 contends that he did and that consequently petitioner should have treated the amount received for the covenant not to compete as ordinary income. The petitioner claims that the allocation of $140,000 to the covenant not to compete was a tax gimmick inserted for the benefit of Knapp and that the purchase price of $220,000 was actually based on the value of the physical assets which were to be transferred to Knapp. It appears to be well established that the question of whether any portion of the selling price of a business should be attributed to a restrictive covenant as opposed to other items in the transaction depends upon whether the parties treated the covenant as a separate and distinct item in their negotiations and whether the purchaser actually paid anything for the covenant as a separate item in the deal. ; , affd. sub nom. (C.A. 10, 1954); , affd., (C.A. 10, 1954); ; , *187 affd. (C.A. 4, 1960), certiorari denied . Although recitations in contracts are not conclusive and do not preclude this Court from considering all the facts in the record, ; Harold W. Cuckler, 39 T.C. - (March 29, 1963), nevertheless, when the parties to a transaction have specifically set out the covenant in the contract and have given it an assigned value, strong proof must be adduced by the party-petitioner if it is his desire to overcome the effect of the contractual recitation. (C.A. 2, 1959), affirming ; , affd., (C.A. 9, 1961); (C.A. 10, 1954). The petitioner testified that his discussions with Knapp usually dealt with whether petitioner was interested in selling and the price he desired for his business, that he knew nothing about the covenant until he saw it in the contract submitted to him by Knapp, and that when he inquired about *188 the covenant's presence in the contract, he was assured by Knapp it would have no adverse effect upon him. Knapp, who was called to testify by respondent, admitted that during his discussions with petitioner relative to the sale of the latter's business, the covenant not to compete was never mentioned and that he had the contract prepared allocating $140,000 to the covenant without discussing it with petitioner. In addition, several expert witnesses summoned by petitioner testified that in their opinion the physical assets transferred to Knapp were worth $220,000 as of the time of transfer. It is apparent from the record that the covenant not to compete was never actually dealt with, never bargained for, never evaluated as a separate item in the transaction. The only discussion the parties had concerning it took place after it had already been inserted into the proposed sales agreement by Knapp and involved the tax consequences to petitioner and not the actual or allocated value of the covenant. See ; In view of the foregoing, we believe the petitioner has adduced sufficient proof to overcome the *189 effect of the allocation in the sales agreement pertaining to the covenant not to compete. Accordingly, we hold that no part of the sales proceeds received by petitioner is attributable to the covenant not to compete. Decision will be entered under Rule 50.